[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
November 15, 2007
THOMAS K. KAHN
CLERK

Nos. 05-10833 & 05-11110
_____

D. C. Docket No. 97-00092-CV-AR-S

PATRICIA GARRETT,

Plaintiff-Appellant,

versus

UNIVERSITY OF ALABAMA AT
BIRMINGHAM  BOARD OF TRUSTEES,

Defendant-Appellee.

_____

Appeals from the United States District Court
for the Northern District of Alabama

_____

**(November 15, 2007)**

Before TJOFLAT and COX, Circuit Judges, and GEORGE,[*] District Judge.

GEORGE, District Judge:

_____

[*] Honorable Lloyd D. George, United States District Judge for the District of Nevada, sitting by designation.

In 1994, the University of Alabama at Birmingham (the University) employed Patricia Garrett as the Director of Nursing, OB/Gyn/Neonatal Services at a hospital that it operated. At the end of August of that year, Garrett was diagnosed with breast cancer. In the following months, she underwent two surgeries, radiation treatment, and chemotherapy.

Three weeks after her surgeries in September, Garrett returned to work full-time. In late December, Garrett requested and received frequent intermittent medical leave to accommodate her treatments. In January 1995, Garrett was hospitalized for leukopenia. Starting March 1, 1995, Garrett took full medical leave, returning to work on July 10, 1995. Several weeks later, after Garrett met with her supervisor to discuss "career goals," she requested and received a transfer to a lower paying position as Nurse Manager at a different facility operated by the University.

Garrett then sued the University pursuant to the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 et seq., for discrimination and retaliation.[1] The district court granted summary judgment in favor of the University, finding that Garrett was not

---

[1] Garrett also brought claims pursuant to the Americans with Disabilities Act, 42 U.S.C. §§12101, et seq. Those claims have already been dismissed because Congress did not validly abrogate the States' sovereign immunity from suit by private individuals for money damages under the ADA. Bd. of Trs. of the Univ. of Ala. v. Garrett, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001).

2

subject to an adverse employment action, not disabled and that the hospital had not retaliated against her. Garrett appeals. We conclude that, although the district court erred in concluding that Garrett was not subject to an adverse employment action, she cannot maintain either her claim for discrimination or for retaliation.

I

Nearly immediately after her diagnosis of breast cancer in August 1994, Garrett underwent two surgeries. This was followed, in the ensuing months, by a course of radiation therapy treatments and then a course of chemotherapy treatments. The first surgery consisted of an excisional biopsy of the mass within her breast. The second surgery, on September 12, removed twenty-eight lymph nodes from the area under Garrett's right arm. As Garrett recovered from the second surgery, she began assisting in her self-care, although she was initially limited to using only her left arm. Three weeks after the surgery, on October 4, Garrett returned to work.[2] Shortly afterward, she began her course of thirty-seven radiation treatments that continued through the end of December of that year. Near the end of these treatments, Garrett received radiation burns to her upper

_____

[2] Garrett worked pursuant to a flexible schedule that both accommodated her radiation treatments, and the additional time she required to complete her duties at work.

3

torso and right arm. Garrett's treating physician notes that her right arm became swollen at this time.

At work, Garrett completed all of her duties but required additional time and took frequent breaks because of fatigue. Garrett had difficulty sleeping, in part because of hot flashes she began to experience after stopping her hormone replacement upon her diagnosis of breast cancer. During her radiation therapy, she began experiencing episodic problems with diarrhea, which sometimes affected her at work. At home, Garrett's fiancé, whom she married in November, performed the household tasks of cleaning, laundry, shopping and cooking.

Late in December, Garrett began her chemotherapy, which lasted for six months through the end of June. Garrett continued to work until the beginning of March pursuant to a flexible schedule, taking intermittent family medical leaves.[3] At that time, she requested and received a medical leave of absence.[4] She continued to suffer with poor sleep, hot flashes, fatigue, and diarrhea. While she did not assist her husband with the household chores, Garrett cared for herself.

---

[3]    During January, Garrett was admitted into a hospital for an infection.

[4]    In considering only the competent evidence offered by Garrett regarding her reason for taking the medical leave, the record indicates that the University intended to transfer her to a position overseeing the University's contract with Cooper Green hospital, but that she instead accepted the University's offer of medical leave. Garrett has not offered any evidence indicating the details of the intended transfer.

She believes that, at that time, she took twice as long to complete her self-care tasks when compared to an average person.  Several times each week Garrett needed her husband's assistance in dressing.

After completing her chemotherapy in June 1995, Garrett returned to work on July 10.  Less than two weeks later, on July 21, Garrett met with her supervisor.  Though the events of that meeting are in dispute, we construe them in the light most favorable to Garrett.  At that meeting, Garrett's supervisor told her that she couldn't stay in her position and that she had to transfer to the nursing pool.  Following that meeting, Garrett submitted a transfer request to the nursing pool and, on July 31, a resignation letter effective August 31.  The following day, Garrett asked that the thirty-day notice be waived to permit her to transfer to a Nurse Manager position effective August 14, 1995.

Garrett argues that the side effects of her treatment for cancer disabled her, substantially limiting her in the major life activities of caring for herself, performing manual tasks, lifting, and working.

II

The Rehabilitation Act prohibits recipients of federal financial assistance from discriminating against individuals with disabilities.  *Bragdon v. Abbott,* 524

U.S. 624, 632, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998).  As acknowledged by the University, it is a recipient of federal funds.[5]

To establish a prima facie case of discrimination under the Rehabilitation Act, Garrett has the burden of showing that (1) she had a disability; (2) she was otherwise qualified for the position; and (3) she was subjected to unlawful discrimination as the result of her disability.  *See, Sutton v. Lader*, 185 F.3d 1203, 1207 (11th Cir. 1999).  As relevant to this action, the Act defines "disability" to mean "a physical or mental impairment that substantially limits one or more major life activities."  29 U.S.C. §705(9)(B).  The Act further establishes that an "individual with a disability" includes "any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities; (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment."  29 U.S.C. §705(20)(B).  We must strictly interpret the terms "major life activities" and "substantially limits" so as "to create a demanding standard for qualifying as disabled . . . ."  *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 197, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002).

---

[5]    The University has not contested that its receipt of such funds constitutes a waiver of its Eleventh Amendment immunity to suit under the Rehabilitation Act.

While the Rehabilitation Act defines neither "major life activities" nor "substantially limits," we look to the regulations of the Equal Employment Opportunity Commission ("EEOC") for guidance, which regulations that agency promulgated to implement the Americans with Disabilities Act.[6] *Gordon v. E.L. Hamm & Assoc., Inc.*, 100 F.3d 907, 911 (11th Cir. 1996). Those regulations suggest that major life activities mean "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. §1630.2(i). The EEOC further notes that this list is not exhaustive, but applies to "those basic activities that the average person in the general population can perform with little or no difficulty." 29 C.F.R. App. §1630.2(i).

Further, in considering whether an individual has a disability, the regulations advise that the following factors are relevant: "(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R.

---

[6] As both parties have relied upon the EEOC regulations interpreting the ADA as reasonable, we follow the lead of the Supreme Court and assume that the regulations are reasonable in the guidance they provide. *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 194, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002).

§1630.2(j)(2). As further explained by the EEOC, "temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities. Such impairments may include, but are not limited to, broken limbs, sprained joints, concussions, appendicitis, and influenza." 29 C.F.R. App. §1630.2(j).

Each claim of disability must be considered on a case-by-case basis. When the symptoms of an impairment vary widely from person to person, "[a]n individualized assessment of the effect of an impairment is particularly necessary." *Toyota*, 534 U.S. 184, 198-99, 122 S.Ct. 681. Thus, it is incumbent upon those "'claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial.'" *Id., at 198 (quoting Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 567, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999)).

## III

Initially, we must address the district court's holding that Garrett could not maintain her discrimination claim because she voluntarily requested her transfer to the lower-paying position of Nurse Manager, and thus never suffered an adverse employment action. This determination was made *sua sponte*, as the defendant

8

neither argued that Garrett had voluntarily requested the transfer nor that she had not suffered an adverse employment action. To the contrary, in an argument addressing Garrett's retaliation claim, the University conceded that "a factual issue [exists] as to whether plaintiff actually wanted to transfer the [sic] Nurse Manager position."[7] The University repeats its concession, verbatim, on appeal.[8] The concession is appropriate, given that Garrett testified that her supervisor told her, on July 21, that she could not stay in her job and that she needed to fill out transfer papers to the nursing pool. Garrett also testified that her supervisor then denied her request that she be allowed to remain in her position until October.[9] After this meeting, she submitted a transfer request to the nursing pool. Garrett's subsequent identification of and request for a less-onerous demotion than suggested by her supervisor–a transfer to Nurse Manager rather than to the nursing pool–does not extinguish the factual issue whether her transfer requests were involuntary. Accordingly, as acknowledged by the defendant, the record requires that we find

---

[7] In moving for summary judgment, the defendant argued only that its *approval* of Garrett's transfer request was legitimate and non-discriminatory.

[8] Again, this concession is made relative to Garrett's retaliation claim.

[9] As the defendant did not brief the issue to the district court whether Garrett's transfer request was voluntary, and Garrett did not oppose that issue, it is unsurprising that the district court overlooked the evidence existing in the record that her transfer request was in response to the July 21, meeting.

9

that an issue of material fact exists whether Garrett voluntarily requested a transfer to a lower-paying position.  In addition, because contested issues of fact must be construed in favor of the non-moving party, we assume for purposes of this appeal that Garrett was subject to an adverse employment action, a demotion, on July 21.

IV

We next consider whether Garrett has shown that she was an individual with a disability, as that phrase is used in the Rehabilitation Act, when she was demoted by her supervisor on July 21.  In seeking to meet her burden on this issue, Garrett relies not only upon the status of her impairments and limitations prior to that meeting but also misplaces her reliance upon her condition years after that meeting.[10]  The Rehabilitation Act does not protect employees who become disabled after the discriminatory act, but protects those employees who were disabled at the time of the discriminatory act.  To maintain a Rehabilitation Act claim for discrimination, an employee must show that she was subjected to

---

[10]     The extent of this misplaced reliance is significant.  She not only offers her own observations of her condition after 1995, but relies upon the deposition testimony and declaration of one of her treating physicians, Dr. John Carpenter.  Dr. Carpenter, however, did not begin treating Garrett until 1997.  Garrett has not shown that Dr. Carpenter had personal knowledge of Garrett's condition in 1994 and 1995.  Garrett also relies upon the declaration and deposition testimony of Mary Kessler to establish her limitation in working.  Dr. Kessler, however, has relied in part upon Dr. Carpenter's expert report in reaching her opinions.

unlawful discrimination as the result of her disability. *See, Sutton,* 185 F.3d at 1207. The determination of whether a person is disabled requires "that a person be presently–not potentially or hypothetically–substantially limited in order to demonstrate a disability. *Sutton v. United Airlines, Inc.,* 527 U.S. 471, 482, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). Since the disability must be the cause of the discrimination, the requirement that a person must presently be substantially limited necessarily means that the person must be substantially limited in a major life activity at the time of the discrimination, and not several years later.

Without dispute, Garrett had breast cancer. To the extent Garrett has offered medical records contemporaneous to her cancer treatment as evidence of her impairments and limitations, those records establish that nearly immediately after her diagnosis of breast cancer, Garrett underwent two surgeries, a course of radiation therapy treatments, and a course of chemotherapy treatments. The first surgery consisted of a biopsy that confirmed the diagnosis of cancer. The second surgery, on September 12, removed not only breast tissue but also twenty-eight lymph nodes from the area under Garrett's right arm. Radiation therapy commenced in October and was completed by December. On December 30, Garrett began chemotherapy. On January 15, she was admitted into the hospital for leukopenia, a complication of her chemotherapy. She was discharged on

January 21, and her chemotherapy dosage was reduced. She completed her chemotherapy on June 16, 1995. Dr. Donald Miller began treating Garrett in October 1994, and completed reports of Garrett's clinic visits starting on October 11, 1994. Regarding side effects of her treatments, the reports note Garrett's hospitalization for leukopenia on February 10, 1995. In addition, Dr. Miller's report of April 4, 1995, notes that Garrett "[came] to the clinic today only with complaints of hot flashes and dyspareunia. She was also asking questions about resuming Estrogen. She denies any headaches, blurry vision, nausea, vomiting, fevers, chills, chest pain, cough, or abdominal pain." The report further notes that Garrett "specifically raised issues of hot flashes, discomfort, emotional swings, and dysparuneia." The medical records that Garrett has submitted do not reflect any other side-effects that she suffered during her treatment.

In his declaration, Dr. Miller notes the following side effects not otherwise included in the medical records submitted by Garrett. Garrett suffered from burns to her arm caused by the radiation therapy. Her arm became swollen. She experienced episodic diarrhea and fatigue.[11] On June 1, 1995, Dr. Miller approved

---

[11] Dr. Miller also noted that Garrett had difficulty sleeping due to hot flashes and other symptoms related to menopause, for which Garrett's hormonal regimen had been discontinued because of her chemotherapy treatment.

12

Garrett's return to work without restrictions.[12]  While Dr. Miller states that Garrett was "very limited" in her ability to use her right arm, and was "unable to perform any medium or heavy positions," he does not identify any objective criteria or testing upon which he based his opinion.

Regarding her impairments and limitations in 1994 and the first part of 1995, Garrett testified in 1997 of her surgery, radiation therapy, and chemotherapy, plus the following events and conditions.  Garrett returned to work on October 3, 1994, but took longer to do her work because of her fatigue.  She noted her hospitalization in January, and her extended medical leave of absence from March through her return to work on July 10.  Garrett testified that she had problems sleeping due to hot flashes, which were due to the cessation of her hormone replacement.  She also noted problems with episodic diarrhea.  In January, she had a significant episode of hair thinning.  She noted that, during the radiation and chemotherapy, she "really was not able to do much of anything for myself.  My husband took over all of the shopping, cooking, housekeeping, that sort of thing, grocery shopping."

Regarding the condition of her right arm, Garrett testified:

_____

[12]     He asserts that he did not note any restrictions because Garrett did not request any restrictions.

13

Now, I – after my node surgery, of course, I have the problem with the arm being much larger than the other and not draining well.

Also during that period of time, the right axillary, of course, had to have an opportunity to heal, and that was awkward.

Also during my radiation at the very end of that I began to get some burns that were difficult to deal with and kind of restricted, you know, movement, but not anything that would restrict my work. Just made it a little more difficult.

She further noted, regarding movement restrictions, that she had difficulty "[r]aising my arms above my head, using my right arm to lift with. Movements with my torso from right to left were often times painful and difficult, related to the burns." In that deposition, Garrett did not offer any other testimony of the extent of her arm's limitations.

Garrett testified that, during the period that she was on medical leave, she was extremely tired, and her day consisted of getting up, dressing, and resting. Other than therapy, her only activities were needle work, reading, or watching television. She became more and more tired as her chemotherapy treatment continued.

In an affidavit signed in December 1997, Garrett noted the following side effects of her cancer treatment. During the period from October through December 1994, she suffered from extreme fatigue, nausea,[13] hot flashes, difficulty

---

[13]     In her deposition, Garrett testified that she really didn't suffer from nausea, due to the medications she was given to control nausea.

sleeping, episodic diarrhea, and her hospitalization for leukopenia. She further noted that when she placed her energy into working, she was too exhausted to function in the home. Regarding her arms, she generally stated that "[she] was not able to . . . lift and move my arms. . . ." As for the period of her medical leave, Garrett noted only that her husband continued to have to carry the great majority of household duties.

Garrett also testified of the side effects of her cancer treatment, and the resulting limitations, in a 2004 deposition. At that time, Garrett added that she believed she had minimized her testimony regarding her disabilities in her 1997 deposition. In particular, she noted that regarding her arms she "could not do a lot of lifting and that sort of thing." She further opined that she "probably" couldn't lift anything over fifteen to twenty pounds.

Finally, Garrett offers her 2004 declaration regarding her impairments and limitations. In addition to what has previously been noted, Garrett provided additional detail of the extent to which she required assistance during the first three weeks after her surgery. She noted that she had no use of her right arm during this time, and that she depended upon her sister and her fiancé, whom she would marry in November, in performing self-care tasks. Garrett noted that she began assisting with her self-care, at first using just her left arm, and that her right

15

arm was limited to lifting no more than ten pounds.  In caring for herself, Garrett opines that, at that time, she took twice as long as most people in performing most tasks.

Garrett further notes that, as she began her chemotherapy, she became able to shower independently, performed self-care activities, and required her husband's assistance dressing several times a week.  She further states that her husband continued to perform the household tasks.  She also asserts that she was limited to lifting fifteen to twenty pounds.  Garrett re-iterates that, during this time, she continued to suffer from fatigue, which caused her to take frequent breaks at work, and to collapse because of exhaustion when she returned home from work.

For several reasons, this evidence of Garrett's impairments and limitations fails to raise an issue of triable fact that she was disabled.  Most notably, the most severe periods of limitation that Garrett suffered during her cancer treatment were short-term, temporary, and contemporaneous with her treatment.  A severe limitation that is short term and temporary is not evidence of a disability.  *See, Sutton,* 185 F.3d at 1209 ("A temporary inability to work while recuperating from surgery is not such a permanent or long-term impairment and does not constitute evidence of a disability covered by the Act.")  Further, absent from the record is any evidence that, from the perspective of July 1995, she was expected to continue

16

to suffer from any long-term or permanent side-effects of sufficient severity to constitute a disability. As to Garrett's fatigue, which was the primary limitation of which she initially complained in 1997, it had already sufficiently diminished to permit her to return to work within weeks of her last chemotherapy session. Regarding the impairment to Garrett's arm, the only evidence of its expected ongoing status is Garrett's statements in 2004 that, sometime after her surgery, she could not lift more than ten pounds, and that she could probably lift fifteen to twenty pounds sometime during her chemotherapy. This evidence suggests only that Garrett's arm was recovering. Finally, we note the lack of any objective evidence of the extent of Garrett's limitations. While Dr. Miller asserts that Garrett was precluded from performing medium or heavy jobs, he has not referenced any objective criteria supporting his conclusion. He did not identify any test that he performed, or required Garrett to perform, to determine the extent of her limitations.

To the extent that Garrett has relied upon her subjective observations of her limitations, her statements are repeatedly couched in general and vague terms. We have previously held that testimony of limitations couched in vague terms is insufficient, particularly in the absence of evidence that a described affliction is

worse than is suffered by many adults. *See, Rossbach v. City of Miami*, 371 F.3d 1354, 1359 (11th Cir. 2004).

Garrett has also failed to show that she was substantially limited in "working." The conceptual difficulties inherent in relying upon a limitation in the ability to "work" as evidence of a disability are compounded, in this matter, by several aspects of the opinion of Garrett's expert regarding jobs from which Garrett is precluded. The expert asserts that Garrett could not perform either medium or heavy jobs, but does not offer any indication that she independently determined that Garrett could not perform these jobs in 1995. Instead, the expert relied solely upon the assessments of Drs. Miller and Carpenter that Garrett could not perform medium or heavy jobs. Dr. Carpenter, however, did not begin treating Garrett until 1997, and his assessment was based only upon his observations of Garrett's condition after 1997. Further, as previously noted, Dr. Miller did not identify or refer to any specific, objective evidence to support his assessment of Garrett's ability to perform medium or heavy work.[14]

---

[14] The record lacks any basis to conclude that the University regarded Garrett has having a disability. While the University had knowledge that Garrett was being treated for cancer, she has not offered any evidence that the University regarded that treatment, or its side effects, as disabling Garrett.

18

Accordingly, Garrett did not meet her burden of showing that she was disabled at the time of her demotion in July 1995.

V

Garrett also cannot maintain her claim for retaliation. To defeat summary judgment as to this claim, Garrett had to show that she engaged in a protected activity, that she suffered an adverse employment action, and that the protected activity was causally connected to the adverse employment action. *Weeks v. Harden Mfg. Corp.,* 291 F.3d 1307, 1311 (11th Cir. 2002).

As protected activities, Garrett points to (a) her request for leave in September 1994 to undergo and recuperate from surgery, (b) her request for intermittent leave beginning in December 1994, and (c) her request for a leave of absence starting March 1, 1995. We assume, without so deciding, that Garrett's various requests for leave were protected activities.

As adverse employment actions for her first requested leave, Garrett asserts that (a) when she returned to work, her supervisor told her that she did not look well and she should leave work and go home, and (b) she was disciplined for not fulfilling her duties. Neither of these events are adverse employment actions, as they do not meet even a minimum "threshold level of substantiality." *See*,

19

*Wideman v. Wal-Mart Stores,* Inc., 141 F.3d 1453, 1456 (11ᵗʰ Cir. 1998).  At

worst, the statements of Garrett's supervisor are innocuous statements of concern

for Garrett's admitted fatigue at work, and a reminder that leave was available to

Garrett if needed.  As Garrett admitted regarding her supervisor's first comment,

she "didn't see [it] as threatening at all, obviously."  As to Garrett's assertion that

she was disciplined, the memorandum upon which she relies states:

> Pat, thank you for attempting to meet the expectations of the service
> line director role we are evolving.  From our conversation last
> Monday, it is apparent that the financial management, strategic
> planning, and physician relations components of this role are not
> sufficiently met.  Nor is this work desirable to you.

Nothing in the memorandum suggests that Garrett was being disciplined.

Regarding the adverse employment action in response to her request for

intermittent leave, Garrett asserts that the University began recruiting to fill her

position.  The only competent evidence offered by Garrett in support of this

assertion is the agenda from a meeting that she did not attend, indicating that the

position of Director of Women's Services was being recruited.[15]  The University

offered undisputed evidence that the position for which it was recruiting was not

Garrett's position, but the service line director for Women's Services.

---

[15]     The Agenda belies Garrett's characterization, in her declaration, that it stated she
was to be replaced.

As to Garrett's request for a leave of absence on March 1, she asserts that the retaliatory adverse action was her demotion on July 21. As previously indicated, Garrett has offered sufficient evidence to place into dispute whether her transfer requests to lower-paying positions were voluntary. A demotion to a lower-paying position is an adverse employment action. Garrett has not shown, however, a causal connection between her request for a leave of absence and her demotion. As evidence of causality, she relies only upon the previously noted events, which we have found were not adverse, and the "timing" of her demotion. Since Garrett has not raised a triable issue of fact that she was subject to any adverse employment action other than her demotion, her claim hinges upon whether she has shown temporal proximity. As summarized by the Supreme Court, "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273, 121 S.Ct 1508, 149 L.Ed.2d 509 (2001). The University had knowledge of Garrett's request for leave before March. She was demoted in July 1995, more than four and one-half months after her request. Garrett's request for a medical leave and her demotion were not temporally close, much less "very close."

21

Accordingly, Garrett did not meet her burden to go forward with her claim of retaliation.

**AFFIRMED.**